IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| LAMAR LYNCH, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | Case No. 09-mc-229-JWL |
| | ) | |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) | |
| | ) | |
| Respondent. | ) | |

## **MEMORANDUM AND ORDER**

Mr. Lamar Lynch challenges the right of the Office of the Inspector General ("OIG") of the United States Department of Housing and Urban Development ("HUD") to obtain by subpoena certain financial records regarding accounts Mr. Lynch maintains at Bank of America. HUD-OIG requested such records for the purpose of investigating whether Mr. Lynch unlawfully received any funds in connection with his participation as a property owner in HUD's Section 8 Housing Choice Voucher program. Mr. Lynch seeks to quash the subpoena pursuant to the Right to Financial Privacy Act ("RFPA"), 12 U.S.C. §§ 3401-3421. For the reasons set forth below, the Court denies Mr. Lynch's motion to quash the subpoena.

1

## I. Factual and Procedural Background

Pursuant to Section 8 of the United States Housing Act of 1937, HUD provides housing assistance to eligible low-income individuals and families. Within this "Section 8 program," as it is commonly known, there is a program entitled the "Housing Choice Voucher program ("Voucher Program"), which specifically assists individuals in acquiring housing in the private market. Under the program, the program participant personally selects his desired housing and a contract ("Housing Assistance Payment" or HAP contract) is then entered into between the Public Housing Authority ("PHA") which administers the program and the owner of the private housing. The PHA pays the property owner directly for a specified sum of money and the program participant is responsible for paying any difference between the charged rent and the amount paid by the PHA. Mr. Lynch received such funds for five properties he owned in Kansas City, Kansas. The program was administered through the Kansas City, Kansas Housing Authority (KCKHA).

In March 2008, Mr. Lynch paid $100 to a caseworker for the KCKHA. The government contends that this money was paid as a bribe, in exchange for the caseworker referring a tenant to housing Mr. Lynch owned. On April 9, 2008, two HUD agents investigating the matter interviewed Mr. Lynch, who admitted to giving the money to the caseworker but stated that he did so not in exchange for a referral but rather because the caseworker was a family friend. On April 10, 2008, the KCKHA sent Mr. Lynch a letter notifying him that he violated Part B 10(a)(3) of his HAP contract and that his existing

HAP contracts were therefore being terminated and he would no longer be permitted to receive Section 8 funding as a landlord in Kansas City, Kansas. The KCKHA decided to terminate all existing contracts with Mr. Lynch and prohibit his further receipt of Section 8 funds under 24 C.F.R. § 982.306(1)-(2), which permits a PHA to prohibit an owner's participation in the event the owner commits "fraud, bribery, or any other corrupt or criminal act in connection with any federal housing program" or otherwise breaches the HAP contract.

In September 2009, a KCKHA inspector noticed that Premier Investment Properties, LLC ("Premier") applied for a HAP contract at a property previously owned by Mr. Lynch. Although the application listed Premier as the property "owner," the application was signed by "Marcus Blockmon." The inspector notified the Director of KCKHA's Section 8 program, who in turn contacted Mr. Blockmon. During this conversation, the Director inquired of Mr. Blockman who owned Premier and how HAP funds were distributed, but Mr. Blockmon could not answer the questions posed. Therefore, on September 8, 2009, KCKHA sent a letter to Premier, Mr. Blockmon, and Mr. Lynch, requesting their presence at a meeting and notifying them that if they did not attend, the relevant HAP contracts could be terminated. Although the letters to Premier and Mr. Lynch were signed for and delivered, none of the parties attended the meeting. The letter to Mr. Blockmon was returned to KCKHA as "unclaimed."

On September 22, 2009, the KCKHA sent a letter to Premier and Mr. Blockmon, notifying them that their investigation indicated Mr. Lynch had been involved with

Premier and that Mr. Blockmon and all members of Premier would therefore likewise be prohibited from participating in the KCKHA Section 8 program. In addition, the letter stated that the Office of the Inspector General had initiated an investigation into the matter. Pursuant to this ongoing investigation, it was discovered that at least eight properties owned by Mr. Lynch had been transferred to Premier, with each transfer occurring less than two months after his termination from the Section 8 program. These eight properties included the five for which Mr. Lynch was receiving funds at the time his participation in the Section 8 program was terminated.

In addition, the Director of the KCKHA Section 8 program allegedly received a phone call from an unidentified individual whose voice she recognized as belonging to Mr. Lynch.[1] The individual stated during this phone call that although KCKHA had stopped payment for several of the caller's properties, he was nonetheless receiving $2,400 in payments from KCKHA for other properties owned and that KCKHA would not be able to close every loophole in its system.

On October 9, 2009, a subpoena was issued requiring disclosure by Bank of America of financial information relating to an account maintained by Mr. Lynch. The subpoena requested financial records during a period from January 1, 2007 to the

---

[1] This information was provided to the Court through the affidavit of Special Agent Amy Durso, rather than the Director who allegedly received the phone call and recognized Mr. Lynch's voice. Regardless of whether the Court credits such testimony, there is sufficient evidence to establish a reasonable belief on the part of the OIG that Mr. Lynch's financial records are relevant to its investigation.

present.[2]  Mr. Lynch filed the present motion in response and, after ordering Mr. Lynch to supplement his motion, the Court concluded that Mr. Lynch had satisfied the requirements of 12 U.S.C. § 3410(a) and therefore ordered the government to respond. (Doc. #6 at 3).

After Mr. Lynch contested the ability of HUD-OIG to obtain such personal financial information, the ongoing investigation revealed the following additional information.  First, it was discovered that Mr. Lynch has exclusive signatory authority for Premier and that, in a letter dated July 25, 2008, Mr. Lynch certified he was the sole owner of Premier.[3]  Next, the investigation revealed that Mr. Lynch occasionally uses the name "Marcus Blockmon" for business purposes, the name on the signatory line for one of Premier's applications for participation in the Section 8 program.  Lastly, Mr. Lynch admitted his involvement in Premier during conversations with Special Agent Amy Durso.  Although Mr. Lynch agreed during these conversations to the disclosure of Premier's financial records, he continued to insist that HUD-OIG had no basis for searching his own personal bank records.

---

[2] Mr. Lynch did not allegedly pay the bribe to the KCKHA caseworker until March 2008. While Mr. Lynch did not contend that the subpoena covers too broad a time span, the Court nevertheless notes that the government's request for documents prior to the allegedly unlawful action may be reasonably related to a legitimate investigation into fraud.  *See Dawar v. United States Dep't of Hous. and Urban Dev.*, 820 F. Supp. 545, 547 (D. Kan. 1993) (finding permissible HUD-OIG's request for financial records to investigate misappropriation of project funds from six months before the individual's participation in the project began).

[3] This information was apparently discovered upon receiving Premier's bank statements pursuant to the investigation.  The information was provided to the Court in the affidavit of Special Agent Amy Durso.

## II. <u>Standards</u>

Mr. Lynch brings his challenge to the subpoena pursuant to the Right to Financial Privacy Act, which permits individuals "to contest government access to certain records held by banks and other financial institutions…by requiring the government authority issuing a subpoena for bank records to notify the bank customer of the subpoena served on the financial institution, as well as the nature of the law enforcement inquiry to which the subpoena relates." *Davidov v. United States Securities and Exch. Comm'n*, 415 F. Supp. 2d 386, 387 (S.D.N.Y. 2006). The RFPA contains three separate bases for quashing such a subpoena: (1) the agency's inquiry is not a legitimate law enforcement inquiry, (2) the records sought are not relevant to the agency's inquiry, or (3) the agency has not substantially complied with the FRPA. *Sandsend Fin. Consultants, Ltd. v. Fed. Home Loan Bank Bd.*, 878 F.2d 875, 882 (5th Cir. 1989).[4] To oppose disclosure of financial records to a government entity such as HUD, the individual must attach to his motion an affidavit (1) stating that the individual is a customer of a financial institution from which financial records are being sought and (2) setting forth his reasons "for believing that the financial records sought are not relevant to the legitimate law enforcement inquiry," as such inquiry is explained by the government in its mandatory notice, or that "there has not been substantial compliance" with the FRPA's requirements.

---

[4] Under the RFPA, a government agency may obtain financial information through an administrative subpoena only if "there is reason to believe that the records sought are relevant to a legitimate law enforcement inquiry" and the government properly serves upon the customer a copy of the subpoena and a notice stating the nature of the law enforcement inquiry "with reasonable specificity." 12 U.S.C. § 3405.

12 U.S.C. § 3410(a). If the Court concludes that the individual has complied with these requirements, the Court "shall order the Government authority to file a sworn response." *Id*. at § 3410(b).

The Court must deny the individual's challenge if it finds "there is a demonstrable reason to believe that the law enforcement inquiry is legitimate and a reasonable belief that the records sought are relevant to that inquiry." 12 U.S.C. § 3410(c).[5] Therefore, in its response, the agency need not establish that the records sought are in fact relevant, but rather must merely demonstrate "a *reasonable belief* that the records sought are relevant." *Matter of SEC Private Investigation/Application of John Doe re Certain Subpoenas,* No. M8-85, 1990 WL 119321, at *2 (S.D.N.Y. Aug. 10, 1990). As explained by the District Court for the Southern District of New York, "[w]hat need be shown is not probable cause, but good reason to investigate. A mere belief is not enough, but a reasonable belief is." *Id*. Therefore, "while the ability of the government to obtain such information may not rest upon governmental whim," this Court has recognized that the standard of relevance is "quite broad." *Whitburn v. United States Department of Treasury*, No. 93-MC-139-PEK, 1993 WL 544285, at *2 (D. Kan. Dec. 9, 1993) (citing *Sandsend*, 878 F.2d at 882 and *Rodriguez v. FSLIC*, 712 F. Supp. 159, 162 (N.D. Cal. 1989).

---

[5] Alternatively, the Court must order the subpoena quashed if it finds that "there is not a demonstrable reason to believe that the law enforcement inquiry is legitimate and a reasonable belief that the records sought are relevant to that inquiry, or that there has not been substantial compliance with the provisions of [the RFPA]." 12 U.S.C. § 3410(c).

7

**III. Analysis**

The notice provided by HUD-OIG stated that it sought Mr. Lynch's financial records "to investigate receipt of funds and participation in the Section 8 Housing Voucher program." In its response to Mr. Lynch's motion, the government has explained that it seeks to uncover potential violations of various federal statutes[6] based upon Mr. Lynch's alleged receipt of KCKHA funds through Premier after receiving notice that he could no longer personally participate in the Section 8 KCKHA program. In his motion to quash HUD-OIG's subpoena, Mr. Lynch asserted that the records sought were not relevant to the legitimate law enforcement inquiry stated in the notice because "no fraud or other illegal acts were committed against the Section 8 program" and "all monies received from the program was [sic] for services rendered." Mr. Lynch therefore contends that the requested financial records are not relevant to any legitimate law enforcement inquiry because he did not engage in any unlawful acts.

The Court previously determined that Mr. Lynch's motion and the allegations contained therein sufficed to satisfy the requirements of 12 U.S.C. § 3410(a). (Doc. #6 at 3). It concluded that Mr. Lynch had adequately set forth his reasons for believing the requested financial records are not relevant to a legitimate law enforcement inquiry and

---

[6] HUD-OIG is investigating potential violations of 18 U.S.C. § 1001 and 18 U.S.C. § 287, criminalizing certain false claims and statements. It also believes Mr. Lynch's conduct might subject him to prosecution for criminal conspiracy and theft of government funds. The government states, for example, that theft of Section 8 funds may be prosecuted as theft under 18 U.S.C. § 641, citing *United States v. McKay*, 274 F.3d 755, 758-59 (2nd Cir. 2001).

8

therefore ordered the government to respond to the motion. Now considering the standards relevant to an adjudication of Mr. Lynch's motion, the Court concludes that the evidence presented by HUD-OIG is sufficient to establish that HUD-OIG seeks the information for a legitimate law enforcement purpose and to establish a reasonable belief on the part of HUD-OIG that Mr. Lynch's personal financial records are relevant to its investigation.[7]

First, as this Court has previously explained, a subpoena issued by HUD's Office of the Inspector General to detect fraudulent activity in HUD programs is "clearly issued pursuant to a legitimate law enforcement investigation." *Dawar v. United States Dep't of Hous. and Urban Dev.*, 820 F. Supp. 545, 547, n.2 (D. Kan. 1993) (concluding that subpoenas issued by HUD's Inspector General Offices for the purpose of investigating misappropriations of funds from a HUD project were issued pursuant to a legitimate law enforcement investigation). *See also* The Inspector General Act of 1978, 5 U.S.C. app. 3 §§ 2, 4(a)(3), 6(a)(4) (charging the OIG with the duty to supervise matters relating to the prevention and detection of fraud in the agency's programs and granting the OIG broad subpoena power). As the Court stated in *Dawar*,

> Congress established Inspector General's Offices in federal agencies for the purpose of, among other things, policing the activities of the agency in order to prevent and detect fraud and abuse in the agencies' programs or operations. The OIG at HUD is charged with conducting and supervising HUD activities relating to the prevention and detection of fraud. The OIG is authorized to have access to records which relate to HUD programs and operations. The OIG has discretion to

---

[7] Mr. Lynch does not assert that HUD has failed to comply with the procedural requirements of the RFPA and the Court therefore will not address the matter.

> investigate matters relating to the administration of HUD programs and
> operations. To that end, the OIG is vested with the power to subpoena documents
> which might reasonably contain information relevant to the investigation.

*Id*. (internal citations omitted)

Second, HUD-OIG has presented sufficient evidence of a connection between Mr. Lynch and Premier for HUD-OIG to maintain more than a reasonable belief that Mr. Lynch's financial records at Bank of America are relevant to its investigation. "Once a person's connection to apparently illicit conduct has been shown, it is relevant to know whether that person's bank account contains evidence of such contact." *Matter of SEC Private Investigation*, 1990 WL 119321, at *2. *See also Rodriguez*, 712 F. Supp. at 162 (where an agency was investigating whether an individual had received profits from participation in a joint venture, and the government provided ample evidence of his participation in the venture, the agency established the relevancy of a subpoena requesting access to his financial records to determine whether the proceeds were deposited in his personal bank account). As discussed above, the government has set forth many bases for concluding that Mr. Lynch has a connection to Premier, including the transfers of Mr. Lynch's properties to Premier, Mr. Blockmon's inability to answer questions concerning Premier despite his signature on the application, Mr. Lynch's signatory authority for Premier, Mr. Lynch's use of the name "Marcus Blockmon," and Mr. Lynch's own admissions of his involvement with Premier. Consequently, the Court concludes that the reasons submitted by HUD-OIG establish the relevance of the subpoenaed financial documents to its investigation.

**IT IS THEREFORE ORDERED BY THE COURT** that Mr. Lynch's motion to quash the subpoena issued by HUD-OIG (Doc. #1) is **denied**.

**IT IS SO ORDERED** this 11th day of December, 2009.

                    s/ John W. Lungstrum
                    John W. Lungstrum
                    United States District Judge